DISTRICT COURT JUDGE BENJAMIN H. SETTLE
MAGISTRATE JUDGE J. RICHARD CREATURA

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA**

ETIENNE L. CHOQUETTE,

               Plaintiff,

    v.

CHRIS DUVALL, et al.,

               Defendants.

NO.  3:15-CV-05838-BHS-JRC

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR: November 10, 2017

**MOTION**

Defendants, Chris DuVall, Michelle Southern, Steven Hammond, Kevin Bovenkamp, and William Hayes, by and through their attorneys, ROBERT W. FERGUSON, Attorney General, and AARON WILLIAMS, Assistant Attorney General, hereby withdraw their pending Motion for Summary Judgment, ECF No. 64, and submit a new motion pursuant to this Court's February 27, 2017 Order, ECF No. 72, at 6. Accordingly, Defendants hereby move the Court for an order granting summary judgment for the Defendants and dismissing Plaintiff's Complaint with prejudice pursuant to Fed. R. Civ. P. 56.

**MEMORANDUM**

**I.      STATEMENT OF FACTS**

**A.    DOC Pharmaceutical Management and Formulary**

Like many managed care organizations, the Department of Corrections (DOC) has a Pharmacy and Therapeutics Committee (PTC), which is a committee of health care practitioners and pharmacists established to manage medication utilization within the DOC.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

1

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Declaration of G. Steven Hammond, ¶ 21. Part of the work of the PTC is to scrutinize all aspects of medication utilization including the development and maintenance of a drug formulary and the development and review of treatment guidelines, protocols, forms, and algorithms prior to implementation to assure consistency with the DOC Formulary document. Hammond Dec., ¶ 21.

The DOC Formulary document is called the DOC Pharmaceutical Management and Formulary Manual (DOC Formulary). Hammond Dec., ¶ 22. The current DOC Formulary lists Gabapentin as a Non-Formulary Drug and refers the reader to the Gabapentinoid Protocol[1], which was first adopted by DOC in September of 2014, for specific criteria for its use for DOC patients. Hammond Dec., ¶ 22. In the past, the DOC Formulary has listed Gabapentin as restricted formulary but, even at that time, close monitoring of its use within the DOC population was an important consideration due to the abuse, misuse, and diversion potential of the drug. Hammond Dec., ¶ 22.

Under the DOC Formulary, specific steps must be taken by DOC primary care practitioners and pharmacists for processing requests for either restricted formulary drugs or non-formulary drugs. Hammond Dec., ¶ 24. These requests are call Non-Formulary Requests (NFR). NFR decisions are not made by the PTC but by individual reviewing pharmacists (occasionally with input from others) in the service of carrying out the DOC Formulary, for which the PTC is responsible. Hammond Dec., ¶ 24. The Chief Medical Officer and Director of Pharmacy select authorized pharmacists to respond to NFRs. Reviewing requests to make sure that they conform to a formulary is a common function of pharmacists in managed care organizations (VA, Group Health, etc.). Hammond Dec., ¶ 24.

[1] The Gabapentinoid Protocol has been updated since September of 2014. Exhibit 3 is a true and correct copy of the Gabapentinoid Protocol as it existed in September of 2014. Hammond Dec., ¶ 23, Exhibit 4, updated version of the Gabapentinoid Protocol adopted by DOC in August of 2015. By far the most common indication for Gabapentinoid treatment in DOC is neuropathic pain, so the Gabapentinoid Protocol focuses primarily on use of Gabapentinoids in the treatment of neuropathic pain. Hammond Dec., ¶ 23. The Gabapentinoid Protocol is an evidence-based, step-by-step, guide for DOC practitioners to evaluate patients for neuropathic pain and to determine the appropriateness for use of Gabapentin in individual cases. Hammond Dec., ¶ 23.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 3:15-CV-05838-BHS-JRC

2

These decisions are part of the broader concept of healthcare utilization management, which is a very common and prominent feature of managed care organizations. Hammond Dec., ¶ 24. NFRs are not prescriptions; they are requests for approval to prescribe a non-formulary or restricted formulary drug. Hammond Dec., ¶ 24

If a practitioner wishes to appeal a Non-Formulary decision, she or he may appeal the decision to a subcommittee, which includes physicians and pharmacists. Hammond Dec., ¶ 25. The final decision of an appealed Non-Formulary request is made by the Chief Medical Officer in consultation with key stakeholders. Hammond Dec., ¶ 25. DOC practitioners can also bring their concerns about a NFR decision and the appropriate care for a patient to the Care Review Committee (CRC)[2] for a decision on whether to authorize treatment of a specific condition with a particular medication. Hammond Dec., ¶ 25.

**B.    Choquette's Clinical History**

Prior to coming into DOC custody, Mr. Choquette had a long history of drug abuse and drug dependence. Hammond Declaration, ¶¶ 32-46. Indeed in discovery he admitted to taking methamphetamines, cocaine, and. marijuana, Declaration of Aaron Williams, ¶ 2, Exhibit 1, Excerpts of Discovery Reponses. He also admitted to ingesting two controlled substances for which he did not have prescriptions during a twelve month period. Williams Dec., ¶ 2, Exhibit 1. In his discovery responses Choquette attempted to minimize these facts by claiming that they all occurred many years ago in the 1990s. Williams Dec., ¶ 2, Exhibit 1.

Choquette's medical records, however, show a long period of unemployment, multiple vague issues not easily characterized by medical diagnosis, and dependence on opioid drugs during the period from 2000 to 2009, which was the period just prior to his

---

[2] The CRC is a group of DOC primary care physicians, physician assistants, and advanced registered nurse practitioners that, according to the OHP, reviews and decides the medical necessity of proposed health care within a cluster of DOC facilities. Hammond Dec. ¶ 12. It meets weekly to discuss interventions that are Level 2 under the Offender Health Plan (OHP) and to decide if those interventions are medically necessary under the OHP. The OHP and the CRC are described in detail in the declaration of Dr. Hammond. Hammond Dec, ¶¶ 8-18.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

3

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

incarceration. Hammond Dec., ¶¶ 32-46. At that time, he attributed his pain complaints primarily to injuries sustained in a motor vehicle accident in 2000. Hammond Dec., ¶¶ 32-36; Exhibits 5-8, Outpatient Clinic Notes. In 2000, Choquette tried Neurontin but immediately felt stomach pain and a lot of abdominal cramps when he got up to 900 mg at nighttime so he stopped taking it. Hammond Dec., ¶¶ 33; Exhibit 6. Neurontin is the brand name for the generic drug, Gabapentin, which is an anti-convulsant sometimes used to treat neuropathic pain. Hammond Dec., ¶ 33; Declaration of Williams Hayes, ¶ 17. It has not been approved by the Food and Drug Administration for treatment of neuropathic pain related to Multiple Sclerosis but can be prescribed off-label for that purpose. Hayes Dec., ¶ 17.

Choquette records indicate he was on as much as 220 mg per day of methadone with oxycodone for "breakthrough" pain. Hammond Dec,, ¶ 41, Exhibit 14, May 7, 2009 outpatient clinical note. He went to a pain clinic on May 7, 2009 after his private sector provider discontinued his oxycodone and decreased his methadone to 80 mg per day. Hammond Dec,, ¶ 41, Exhibit 14, May 7, 2009 outpatient clinical note. In his deposition, Choquette admitted that these changes in his prescriptions had been made because his provider at the time had reduced his opioid medications because she, "thought I was reusing it inappropriately" but he denies that he was abusing his prescriptions at that time. Williams Dec., ¶ 2, Exhibit 2; Excerpts of the Deposition of Etienne Choquette, at 43-44.

On July 6, 2009, Choquette saw Neurologist, Dr. Michael Elliott, M.D. Dr. Elliott stated, "from his history he does not fit typically for multiple sclerosis". Hammond Dec., ¶ 43. Because of the vagueness of his symptoms, Choquette was referred to see a MS Specialist, Dr. Mariko Kita, M.D. Hammond Dec., ¶ 43. Dr. Kita saw Choquette on August 5, 2009 and made a preliminary diagnosis of MS. Hammond Dec., ¶ 44. On September 24, 2009, Mr. Choquette saw Dr. Kita again, who confirmed his diagnosis of MS. Dr. Kita did not recommend anything for his pain but, instead left pain management, to Dr. Antoine

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

4

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Jones, M.D., a pain specialist. Hammond Dec., ¶¶ 41, 45. Dr. Jones also saw Choquette on September 24, 2009. His notes from that date state, "because of the patient's widespread migratory pain complaints, I was unsure whether this was related to his spine or his multiple sclerosis". Hammond Dec., ¶ 45, Exhibit 19, September 24, 2009 Outpatient Clinic Note by Dr. Jones. On that same date, Dr. Jones suggested that Choquette consider Gabapentin for his neuropathic pain symptoms and, after explaining that it was highly unlikely that the drug would cause stomach bleeds in response to Choquette's concerns from his earlier trial of the drug in 2000, he prescribed Gabapentin. Hammond Dec., ¶ 45, Exhibit 19.

According to Dr. Hammond there is a gap in the medical records between September 2009 and February of 2011, when he came into DOC custody, possibly because Choquette was in jail during that period. Hammond Dec., ¶ 47; *see also*, *State v. Choquette*, No. 41769-3-II, 2013 WL 749520, at *1–2 (Wash. App. Feb. 26, 2013) (Detailing the dates when Choquette committed his crime and was arrested). Choquette came into DOC custody in February of 2011. At that time he was still taking Gabapentin. Hammond Dec., ¶ 47; Exhibit 20, Clallam Co. Jail Medical Records.

Based on his medical records from February 9, 2011 to September 20, 2011, Choquette was seen by DOC providers for various conditions including his Multiple Sclerosis and lower back pain at least 13 times. On September 20, 2011, Choquette was seen by DOC physician, Dr. Benjamin Rodriguez, M.D., who stated:

> This is a 47 year old man who has diagnosed multiple sclerosis in 2009. However, he feels that he has had symptoms of MS since a motor vehicle accident in 2000. He had chronic pain syndrome since then. He also states that he has discogenic back disease and also scoliosis, which contributes to his chronic pain. He is on Neurontin for that.

Hammond Dec., ¶ 49;  Exhibit 22, September 20, 2011 chart note.

According to Choquette's medical records on May 8, 2012, he was seen by Neurologist Dr. John Chapin, MD. Dr. Chapin's Outpatient Clinic Note states:

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

5

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

He carries a past diagnosis of multiple sclerosis in imaging abnormalities and brain and cervical cord. I don't believe that multiple sclerosis is producing his current complaints of low back pain and intermittent leg weakness as his neurologic examination today shows normal strength in both legs, reasonably well preserved sensory function, no evidence of hyperreflexia.

He has chronic low back pain with known degenerative disc disease. Lumbar spinal stenosis with claudication can be considered but even this seems less likely as his history has major inconsistencies. For example, he states that some days in recent weeks he can walk all day without difficulty and at other times he can walk only 2 feet before he collapses and falls. This is not the story of lumbar spine stenosis with claudication. His neurologic examination today again does not suggest a significant neurologic injury to correlate with the very severe symptoms he describes. Based on his neurologic examination I can see no reason why he would collapse to the floor after two steps.

Hammond Dec., ¶ 50; Exhibit 25, May 8, 2012 Outpatient Clinic Note.

Choquette was seen by DOC Physician, Dr. F. John Smith, MD, on May 16, 2012 for a review of his chronic low back pain, multiple sclerosis, and need for a wheel chair. Dr. Smith's examination on that date showed the patient's motor functions demonstrated good muscle tone and strength, coordination on all four extremities, some mild diminished strength in upper extremity. Hammond Dec., ¶ 53; Exhibit 26, May 16, 2012 Smith Chart Note. According to Dr. Smith, Choquette reported that the diminished strength was related to an old injury. Hammond Dec., ¶ 53; Exhibit 26. Dr. Smith went on to state that Choquette had chronic low back pain secondary to old injuries, unrelated to Multiple Sclerosis, with no significant radiculopathy and no evidence of functional loss. Hammond Dec., ¶ 53; Exhibit 26. Dr. Smith explained to Choquette that part of his problem was an avoidance of pain issue not related to his Multiple Sclerosis and that his Multiple Sclerosis was stable and that it was not in his best interest to continue in the wheel chair. Hammond Dec., ¶ 53; Exhibit 26.

Between May 2012 and July 2013, Choquette was seen by DOC providers for medical concerns on at least five occasions. Hammond Dec., ¶ 55; Exhibit 28, July 9, 2013 chart note. On July 9, 2013 Physician's Assistant (PA) Jo Ella Phillips saw Choquette to discuss Multiple Sclerosis issues. Hammond Dec., ¶ 55; Exhibit 28. Choquette complained of increasing micro-spasms in his legs and that he could not sleep with this occurring. Hammond Dec., ¶ 55;

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Exhibit 28, PA Phillips increased his Baclofen to address these concerns. Hammond Dec., ¶ 55; Exhibit 28. At that time, Choquette was taking 1200 mg of Gabapentin twice a day. Hammond Dec., ¶ 55; Exhibit 28.

On November 7, 2013, Choquette was seen by Neurologist, Steven Chung, MD. Dr. Chung stated, "[t]he patient's neurological exam was essentially normal except for subjectively reduced pinprick sensation over the left upper and lower extremities". Hammond Dec., ¶ 57; Exhibit 31, November 7, 2013 Outpatient Clinic Note. Dr. Chung went on to state:

> Based on my examination, I do not feel that the patient has a multiple sclerosis exacerbation. It appears he remains stable on Avonex injection for multiple sclerosis.
>
> However, he is experiencing chronic symptoms of multiple sclerosis primarily of muscle spasticity and neuropathic pain.
>
> For the muscle spasticity/muscle spasm, baclofen may be increased to 30 mg three times a day. For neuropathic pain, the Gabapentin may be increased with addition of 600 mg in the midday and consider increasing to 1200 mg three times a day thereafter.

Hammond Dec., ¶ 57; Exhibit 31.

On November 27, 2013, PA Phillips submitted an NFR for approval of Gabapentin at 800 mg three times a day. Hammond Dec., ¶ 59; Exhibit 33, November 27, 2013 NFR. While the NFR does list Multiple Sclerosis as a diagnosis, it also lists chronic back pain from degenerative joint disease as a relevant diagnosis. In Dr. Hammond's clinical experience of treating patients with Multiple Sclerosis, neuropathic pain is not a common symptom of Multiple Sclerosis. Hammond Dec., ¶ 59; Exhibit 33. The NFR stated nothing about neuropathic pain. However, it did discuss a history of documented findings of a right side herniated disc impinging the nerve root and with severe piercing pain in the low back. Hammond Dec., ¶ 59; Exhibit 33. The November 27, 2013 NFR was denied by Dr. Cris DuVall, PharmD as part of her regular utilization management duties under the DOC Formulary. Hammond Dec., ¶ 59; Exhibit 33. Dr. DuVall recommended clinical observation

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

7

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

and management without Gabapentin and to consider a Baclofen increase to maximum of 150 mg per day. Hammond Dec., ¶ 59; Exhibit 33[3].

In a Primary Encounter Report (PER) dated December 5, 2013, PA Phillips stated:

Pt presents to clinic today at my request because the NFR for Gabapentin was denied. I have talked with Dr. Chung, his neurologist, about Dr. Hammond's recommendation to stop the Gabapentin and to use Baclofen 150mg PO divided doses over the day. Dr. Chung said that neuropathic pain does go along with MS, but that this might be a good opportunity to determine if his pain is mostly neuropathic or due to spasticity.

PA Phillips went on to state in the "plan" section of the PER:

Discussed with pt that I filed a renewal of the NFR for Gabapentin but that it was denied. At the suggestion of Dr. Hammond and agreement with Dr. Chung, we are going to try increasing the dose of Baclofen and see if that manages the pain. I am titrating Baclofen up to 40 mg TID, If pain is not managed at that level, or is not tolerated let me know.

Accordingly, Dr. Chung was in agreement with the plan to try Baclofen. Hammond Dec., ¶ 63; Exhibit 37, December 5, 2013 PER.

After several weeks of trial with the higher dose of Baclofen, PA Phillips submitted another NFR for Gabapentin on January 6, 2014, this time with more information about Choquette's symptoms as they related to pain secondary to Multiple Sclerosis. Hammond Dec., ¶ 66; Exhibit 40, January 7, 2014 NFR. Dr. Michelle Southern, PharmD, conducted the NFR review. Hammond Dec. ¶ 66; Exhibit 40. Dr. Southern conducted research into the efficacy of Gabapentin for Multiple Sclerosis in a resource that is available to the DOC providers called Up-To-Date. Up-To-Date, contains summaries of the latest clinical evidence for treating

---

[3] There are several emails regarding the November 27, 2013 NFR. Hammond Dec. ¶¶ 60-61. They demonstrate that the NFR was not at all clear regarding the reason for the need for Gabapentin. Hammond Dec. ¶¶ 60-61. There was discussion about Choquette's complaints of Degenerative Joint Disease, DJD. Hammond Dec. ¶¶ 60-61. Dr. Hammond explains that neither he nor Dr. DuVall held that Choquette's discomfort was due to DJD. Hammond Dec. ¶ 61. His comments about that in a December 2, 2013 email relate to the impossibility of discerning from the NFR what the reason for prescribing Gabapentin was----this was less about Choquette's case in particular than about trying to get practitioners requesting Gabapentin to be very precise in spelling out the need for it. Hammond Dec. ¶ 61. Dr. Hammond states, [w]e were truly puzzled by the idea that Gabapentin was required to treat neuropathic pain related to Multiple Sclerosis because this has not been a common feature of Multiple Sclerosis in our clinical experience, nor is it listed as a prominent feature in clinical reviews such as UpToDate". Hammond Dec. ¶ 61.

medical conditions. Hammond Dec. ¶ 66; Exhibit 40. Her research indicated that the only off-label use of Gabapentin in Multiple Sclerosis was limited to nystagmus, which is an eye condition. Hammond Dec. ¶ 66; Exhibit 40. Dr. Southern denied the request but also stated, "please refer this patient's case to CRC for additional review, and if approved then an NFR can be resubmitted at that time". Hammond Dec. ¶ 66; Exhibit 40.

On January 17, 2014, PA Phillips wrote a lengthy note that she was going to present Choquette's case to the CRC to get guidance on whether or not his symptoms were actual neuropathic pain that should be treated potentially with Gabapentin. Hammond Dec. ¶ 68; Exhibit 43, January 17, 2014 Phillips chart note. She noted that she had examined him the previous day and that he could perform all of his activities of daily living as of that date. Hammond Dec. ¶ 68; Exhibit 43.

On January 29, 2014, PA Phillips presented Mr. Choquette's case to the CRC for a determination of the medical necessity for treatment of neuropathic pain secondary to Multiple Sclerosis. Hammond Dec. ¶ 69; Exhibit 44, January 29, 2014 CRC Report. The CRC discussed his case and found that the proposed intervention was not necessary. Hammond Dec. ¶ 69; Exhibit 44. At the same time, the CRC discussed sending Choquette to a general neurologist of a Multiple Sclerosis specialist in light of his symptoms. Hammond Dec. ¶ 69; Exhibit 44.

Choquette was then transferred to another facility, the Monroe Correctional Complex, in Monroe Washington, to await his appointment with the specialist. Hammond Dec. ¶ 71. Because of transportation needs, the clinic's work load, and the need to send medical records to a specialist before they will decide to see a patient, it took several weeks (until April 17, 2014) to schedule an appointment with the Harbor View Multiple Sclerosis clinic for Choquette. Hammond Dec. ¶ 71. According to Dr. Hammond, this delay was not foreseeable or intentional. Hammond Dec. ¶ 71.

On April 17, 2014, Choquette was seen by Neurologist and Multiple Sclerosis Specialist, Dr. Annette Wundes, MD. Hammond Dec. ¶ 72; Exhibit 46, final report. In it she

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 3:15-CV-05838-BHS-JRC

9

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

recommended that DOC restart Gabapentin for neuropathic pain and spasticity. Hammond Dec. ¶ 72; Exhibit 46. Her report is silent about Choquette's past history with drug abuse, which is a relative counter-indication for Gabapentin[4].

Just six days later, on April 23, 2014, Choquette's case was again presented to the CRC, this time by his physician in Monroe, Dr. Diego Lopez de Castilla, M.D. Hammond Dec. ¶ 73. The CRC reported that his neurological exam was normal and that the remainder of his exam was "completely normal". Hammond Dec. ¶ 73. It also shows that Choquette had been in the infirmary at Monroe for two months without Gabapentin and was still "very functional". Hammond Dec. ¶ 73. Finally, the CRC report from that date states that Choquette had a history of polysubstance abuse[5]. Hammond Dec. ¶ 73.

The CRC's determination on April 23, 2014 was that treatment with Gabapentin was not medically necessary. Hammond Dec. ¶ 76. However, there was a suggestion that the presenter, Dr. Lopez de Castilla, contact the consulting neurologist, Dr. Wundes, regarding the committee's concerns about the appropriateness of Gabapentin for the patient. Hammond Dec. ¶ 76; Exhibit 48, April 23, 2014 Report.

On April 23, 2014, Dr. Diego Lopez de Castilla emailed Dr. Wundes explaining:

> Gabapentin is a restricted drug in the Department of Corrections. For that reason I presented Mr. Choquette to the Clinical Review Committee this morning and requested to get approval for Gabapentin. The Committee denied the use of Gabapentin.

---

[4] In her deposition, Dr. Wundes admitted that providers who work in prisons know more about which drugs are abused in prison than she does. Williams, Dec., ¶ 2; Exhibit 3, Excerpts of the Deposition of Annette Wundes, M.D. at 26. She also admitted that providers should be cautious about prescribing Gabapentin to patients with a history of polysubstance abuse. Williams, Dec., ¶ 2; Exhibit 3 at 65. Nevertheless, her report is silent on the issues. Hammond Dec., Exhibit 46.

[5] Dr. Hammond states that he does not recall what documents the CRC may have reviewed regarding Choquette's past drug use during the April 23, 2014 CRC meeting or the previous CRC meeting in January of 2014. Hammond Dec. ¶ 74. However, because Gabapentin is a drug known to be abused and/or misused in DOC facilities, the CRC regularly accesses Offender Needs Assessments (ONA), which is a series of questions asked of the offender soon after intake into the prison system and then periodically thereafter. Hammond Dec. ¶ 74. Choquette's ONA from February of 2011 shows that he admitted to taking Methamphetamine, Cocaine, Hallucinogens, and Marijuana. Hammond Dec. ¶ 75; Exhibit 47. February 24, 2011 ONA.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

10

> The Committee felt that the use of Gabapentin was more based on a clinical symptom (reported by the patient with prior history of Polysubstance abuse) rather than on an objective abnormality on physical exam. The Committee asked me to contact you and ask for your opinion.

Hammond Dec. ¶ 77; Exhibit 49, April 23, 2014 email chain. Dr. Wundes responded explaining that that she had not seen Gabapentin abuse in her practice and that she did not doubt the presence of Choquette's pain. Hammond Dec. ¶ 77; Exhibit 49. Dr. Lopez de Castilla then emailed Dr. Hammond asking, "should I present to the CRC next week". Hammond Dec. ¶ 77; Exhibit 49. Dr. Hammond responded stating:

> Yes, I would recommend re-presenting in light new information. I beg to differ with some of Dr. Wundes' expressed opinions but that is neither here nor there, although I will grant that she is the expert in evaluating and managing MS.

> Having worked in several care settings it is interesting how one's clinical understanding is shaped by different practice experiences.

Seven days later, on April 30, 2014, Dr. Diego Lopez de Castilla presented Choquette's case to the CRC again. With the benefit of the reassurances from Dr. Wundes, the CRC authorized treatment with Gabapentin as Level I, medically necessary. Hammond Dec. ¶ 77; Exhibit 49; Exhibit 50, April 30, 2014 CRC Report.

Choquette has remained on Gabapentin ever since April 30, 2014. Hammond Dec. ¶ 79. His case has been reviewed annually as required by the DOC Formulary and each time his requests for treatment with Gabapentin have been approved. Hammond Dec. ¶ 79. Dr. Hammond states, "I strongly support the annual review of Gabapentin. It is important to make sure that patients are still getting a therapeutic benefit from the drug and that the drug is not being abused or diverted". Hammond Dec. ¶ 79.

C.    **Security Concerns Over Gabapentin Abuse in Prisons.**

According to the Declaration of Robert Herzog, DOC Deputy Director of Prisons, all of the concerns that are present with illicit drugs coming from outside the prison, apply equally to

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

11

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

prescription drugs like Gabapentin, which is a drug of abuse in DOC[6]. Declaration of Robert Herzog, ¶¶ 3-7. Recreational use of such sought-after drugs can lead to violence, coercion, extortion, a black market, higher costs to taxpayers, overdoses, and medical emergencies. sought-after prescription drugs can lead to coercion and extortion of inmates who have prescription access to them. Herzog Dec. ¶¶ 3-10.

## II.    ISSUES PRESENTED

1.    Whether summary judgment should be granted to Defendants because Choquette's allegations amount to nothing more than a dispute between him and his providers about the proper course of treatment or a disagreement among qualified medical professionals?

2.    Whether all defendants are entitled to qualified immunity because there is no clearly established law that their actions constitute a constitutional violation?

3.    Whether Plaintiff's claim for injunctive relief should be denied because he is already taking Gabapentin and any claim that he will not be provided it in the future is purely speculative?

## III.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if the moving party shows "there is no genuine issue of material fact. Fed. R. Civ. P. 56(a). A genuine issue of material fact is not raised by conclusory or speculative allegations. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Additionally, the nonmoving party cannot "defeat summary judgment with allegations in the complaint, or with unsupported

---

[6] Defendants' expert testifies that Gabapentin is abused in prisons in the United States. Declaration of J. David Kenney, M.D., ¶ 7-12; Exhibits 1-24, Scholarly articles showing that Gabapentin is abused.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

12

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

### IV.   ARGUMENT

**A.   The Type Of Policy Used By DOC To Provide For A Higher Level Of Review For The Use Of Non-Formulary Drugs Is Constitutional Because It Is Not A Blanket Ban; Choquette Is Being Provided Gabapentin As A Result Of That Policy**

In many of the conclusory paragraphs in Choquette's Complaint, Defendants have somehow violated the constitution with their policy on Gabapentin. *See e.g.* ECF No. 61, at 10. Choquette is apparently alleging DOC had a blanket policy to either deny gabapentin whenever it was prescribed for neuropathic pain, or to deny any treatment for neuropathic pain whatsoever.

Such a blanket policy might arguably be constitutionally prohibited. *See e.g. Snow v. McDaniel,* 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Colwell v. Bannister,* 763 F.3d 1060, 1069 (9th Cir. 2014). However, Choquette's own Complaint and the documents attached to it demonstrate that there is no such blanket policy.

The term "blanket" as used in this context means, "effective or applicable in *all* instances or contingencies" (emphasis supplied). *Webster's Third New International Dictionary of the English Language Unabridged* 230 (2002). The term "all" as used in this context means "every member or individual component of: - used distributive with a plural noun or pronoun to mean that the statement is true of every individual considered". *Webster's Third New International Dictionary of the English Language Unabridged* 54 (2002). By definition, a blanket policy has *no* exceptions. And Choquette's own Complaint confirms that before he ever filed this lawsuit, the CRC *did* approve him to receive Gabapentin. ECF No. 61, at 13, 62; Hammond Dec. ¶ 79. So Choquette's own admission in his Complaint that he is being treated with Gabapentin demonstrates that at least one person was able to receive Gabapentin under DOC's policy so, by definition, DOC's policy is not a *blanket* policy. And

the cases holding that blanket policies are unconstitutional are inapposite here because they all involved instances where the record supported an inference that in practice the requested medical treatments were *never* provided. *See Snow,* 681 F.3d at 986-987 (record supported inference that in practice the Utilization Review panel *never* allowed the surgery for death-row inmates); *Colwell,* 763 F.3d at 1069 (formal policy permitted case by case consideration but evidence showed review panel *always* denied cataract surgery as long as prisoner has one good eye). Accordingly, there is no dispute over whether DOC has a blanket policy; the undisputed facts demonstrate there is no such policy and Choquette's blanket policy claim fails as a matter of law.

**B.**      **The Undisputed  Facts of Choquette's Case Demonstrate Without Question That Defendants Were Not Deliberately Indifferent**

An Eighth Amendment medical claim requires proof: (1) that the prisoner had a "serious medical need," (2) the prison official was deliberately indifferent to that need, and (3) as a result the prisoner faced a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (2004). It requires proof that the prison official knew of and disregarded an excessive risk to the inmate's health and safety. *Farmer*, 511 U.S. at 837. Inadvertent or isolated occurrences of neglect do not state a claim for deliberate indifference to serious medical needs. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). Even gross negligence is insufficient to establish deliberate indifference. *Toguchi*, 391 F.3d at 1060.

Defendants will concede that multiple sclerosis is a serious medical condition. But they vigorously deny that they were deliberately indifferent to Choquette's care. The undisputed facts show a lot of discussion about whether this particular drug was appropriate for him. Hammond Dec. ¶¶ 59-61. DOC providers did consider increasing Gabapentin as suggested by a neurologist, Dr. Chung, in November of 2013. Hammond Dec. ¶ 57; Exhibit 31. Dr. Chung's

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

14

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

findings state that he did not feel Choquette had a multiple sclerosis exacerbation. Hammond Dec. ¶ 57; Exhibit 31.

After the decision was made to try Baclofen instead of Gabapentin PA Phillips contacted Dr. Chung. Hammond Dec. ¶ 63; Exhibit 37. Her December 5, 2013 note from that conversation states:

> Pt presents to clinic today at my request because the NFR for Gabapentin was denied. I have talked with Dr. Chung, his neurologist, about Dr. Hammond's recommendation to stop the Gabapentin and to use Baclofen 150mg PO divided doses over the day. Dr. Chung said that neuropathic pain does go along with MS, but that this might be a good opportunity to determine if his pain is mostly neuropathic or due to spasticity.

Hammond Dec. ¶ 63; Exhibit 37, Accordingly, Dr. Chung agreed with the decision to try Baclofen for Choquette. This fact is dispositive of all of Plaintiff's allegations against Dr. DuVall, who only denied a request, which could have been appealed by PA Phillips or Dr. Chung. Hammond Dec. ¶¶ 25, 60-61. It is also dispositive of all allegations against Dr. Hammond regarding the November 27, 2013 NFR because not only did he not ignore Dr. Chung----he and Dr. DuVall gave the request for Gabapentin a lot of thought and did consider Dr. Chung's report----but Dr. Chung was in agreement with the substitution of Gabapentin. Hammond Dec. ¶ 63; Exhibit 37. So there was not disagreement among medical providers regarding discontinuing Gabapentin in December of 2013[7].

After several weeks of trial at the higher dose of Baclofen, it was decided to take Choquette's case to the CRC in January 2014. Hammond Dec. ¶ 82. The committee decided that treatment with Gabapentin was not medically necessary at their January 29, 2014 meeting. Hammond Dec. ¶ 82. However, in light of the committee's discussion, it was decided to send him to the Harborview Medical Center Multiple Sclerosis clinic specialist in Seattle.

---

[7] In her deposition, Dr. Wundes, the MS Specialist testified there was nothing wrong with trying a different drug for Choquette's condition, though she was not surprised that Gabapentin did not work. Williams Dec. ¶ 2; Exhibit 3 at 46.

Hammond Dec. ¶ 82. Again, sending someone to see a specialist is clearly not deliberate indifference; it is deliberate caring.

Choquette was then transferred to another facility to await his appointment with the specialist. Hammond Dec. ¶ 83. Because of unforseen transportation needs, the clinic's work load, and the need to send medical records to a specialist before they will decide to see a patient, it took several weeks (until April 17, 2014) to schedule an appointment with the Harbor View Multiple Sclerosis clinic for him. Hammond Dec. ¶ 83. The Harbor View Multiple Sclerosis specialist, Dr. Wundes, again recommended Gabapentin for treatment in addition to making other recommendations for Choquette's care. Hammond Dec. ¶ 83.

Just six days later, on April 23, 2014, the CRC considered treatment of Choquette with Gabapentin again and found the intervention was not medically necessary because the CRC felt that the request for Gabapentin was more related to his history of polysubstance abuse than a true medical need. Hammond Dec. ¶ 84. However, the CRC did ask his provider to reach out to Dr. Wundes to explain the CRC's concerns, and to get the specialist's opinion on re-starting Gabapentin. Hammond Dec. ¶ 84. Gabapentin is not advisable for persons with a history of polysubstance abuse. She responded that she believed Gabapentin was appropriate in Choquette's case, regardless. Hammond Dec. ¶ 84. Then just seven days later, on April 30, 2014, the CRC again considered Choquette's case. With the benefit of the reassurances from Dr. Wundes, the CRC authorized treatment with Gabapentin as Level I, medically necessary. Hammond Dec. ¶ 85; Exhibit 50. The committee has approved renewal of Choquette's use of Gabapentin annually since its approval in 2014. Hammond Dec. ¶ 85.

These facts regarding the approval of Gabapentin in April of 2014, show that clearly there was no deliberate indifference. Choquette admits that he had a history of drug abuse and Dr. Wundes admitted in her deposition that physicians should be cautious about prescribing the drug to patients with such histories, though she maintains the drug was appropriate for Choquette. Williams, Dec., ¶ 2; Exhibit 3 at 65. Even though Dr. Wundes admitted that drug

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

16

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

abuse is an important consideration in prescribing Gabapentin, her report was silent on the subject. Williams, Dec. ¶ 2; Exhibit 3 at 65. Under those circumstances, the CRC was being deliberately caring by pointing out Choquette's history of abuse to Dr. Wundes. In fact, in her deposition Dr. Wundes admitted that there was nothing wrong with the CRC asking her a question. So again, there is no evidence of deliberate indifference in this case at all.

**C.      Where, As Here, A Policy Is Security-Based And Does Not Completely Foreclose Provision Of The Requested Treatment In Individual Cases, That Policy Is Constitutional Even If The Policy Is Not Based On Medical Reasons**

Courts have repeatedly held that drug abuse in prison is a serious security concern. For instance, as stated by the Supreme Court, "[d]rug and alcohol abuse by prisoners is unlawful and a direct threat to legitimate objectives of the corrections system, including rehabilitation, the maintenance of basic order, and the prevention of violence in the prisons". *Overton v. Bazzetta*, 539 U.S. 126, 129 (2003). This view is confirmed by the Declaration of Robert Herzog, who details DOC's legitimate penological concerns with diversion abuse, and misuse of Gabapentin. Herzog Dec. ¶¶ 3-11. DOC's policy of requiring a higher level of review for Gabapentin is, accordingly, a security based policy. Furthermore, Dr. Wundes now concedes that Gabapentin is a drug of abuse and Defendants' expert, Dr. Kenney, has demonstrated in his declaration, that abuse of Gabapentin is well documented. Kenney Dec. ¶¶ 13-18; Exhibits 1-24.

It is established law that a security-based policy that restricts medical care is constitutional even if that policy is not based on medical reasons. To prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (citing *Estelle,* 429 U.S. at 106). The subjective prong recognizes that, in issues of security, "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

17

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

internal order and discipline and to maintain institutional security." *Kosilek,* 774 F.3d at 92 (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). Importantly, that deference extends to prison security measures including prophylactic or preventive measures intended to reduce the incidence of breaches of prison discipline. *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986).

This doctrine is also recognized in the Ninth Circuit. *Chess v. Dovey*, 790 F.3d 961, 974 (9th Cir. 2015) ("Because in a subset of medical cases prison officials will have to balance prisoner health and safety against 'competing institutional concerns for the safety of prison staff or other inmates, these decisions are entitled to deference'") (citing, *inter alia*, *Kosilek,* 774 F.3d at 83). "In consequence, even a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security". *Kosilek*, 774 F.3d at 83 *(*citing *Cameron v. Tomes,* 990 F.2d 14, 20 (1st Cir. 1993)) (requiring courts to "embrace security and administration, ... not merely medical judgments).

In *Kosilek* the First Circuit was presented with a case similar to this case. There, as here, the Massachusetts DOC had a policy where medical recommendations would be made by a prison health services provider and there, as here, higher officials, in that case the DOC Commissioner and the DOC Director of Health Services, were responsible for assessing whether the recommended treatment would create increased security concerns and would have the final say as to whether or not a specific treatment would be provided. *Kosilek,* 774 F.3d at 69. And there, as here, the Plaintiff argued that DOC's policy amounted to a de facto ban against the medical treatment the prisoner wanted. *Id.* at 91. Even though the procedure was denied through the operation of the policy, since the Massachusetts DOC disclaimed any attempt to create a blanket policy, the policy was permissible because it was security-based and did not foreclose an inmate from ever receiving the proposed treatment in the future. *Id.* at 90–91.

Here, DOC's Gabapentinoid Protocol and its OHP are analogues to that used by Massachusetts DOC. Both policies require a separate level of review for some courses of treatment beyond the treating provider to higher level DOC authorities. And Choquette's own Complaint confirms that he is being treated with Gabapentin that was approved by the CRC, so clearly there is no blanket ban just like the Massachusetts's DOC policy in *Kosilek*. Further, the *Kosilek* Court found, as stated above, that the subjective prong of the Eighth Amendment analysis recognizes that, in issues of security, "[p]rison administrators ... should be accorded wide-ranging deference". *Id.* at 92 (citing *Bell*, 441 U.S. at 547). In conclusion the *Kosilek* Court held that, "[a]s long as prison administrators make judgments balancing security and health concerns that are 'within the realm of reason and made in good faith,' their decisions do not amount to a violation of the Eighth Amendment". *Id.* (citing *Battista v. Clarke*, 645 F.3d 449, 454 (1st Cir. 2011)). So just as it was appropriate for the Massachusetts DOC to have an analogous policy, it is appropriate and reasonable for DOC to have a security-based policy of requiring a higher level of approval for Non-Formulary drugs that are abused in the prison population, such as Gabapentin. This is not a constitutional violation.

D.   **DOC Providers, Not Outside Consultants Have "Superior" Knowledge About Drug Abuse In Prisons**

The general rule is that "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987. In contradiction of this principle, Choquette repeatedly claims in his Complaint that a cognizable claim can exist when DOC providers relied on what he pejoratively calls their "inferior" knowledge rather than the recommendations of his outside consultants. ECF No. 61, at 5-8, 10-11. This novel Superior/Inferior claim is apparently based on cases like *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992), which arguably stands for the proposition that a treatment decision may be medically unacceptable and not based upon an honest difference in medical opinion when

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

19

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

prison officials 'choos[e] to rely upon a medical opinion which a reasonable person would likely determine to be inferior'". Again because DOC providers *did* provide Choquette Gabapentin after he saw MS. Specialist Wundes and because outside neurologist Dr. Chung *agreed* with the decision to discontinue Gabapentin, cases like *Hamilton* are inapposite.

**E.   Dr. Hayes and Defendant Bovenkamp Did Not Personally Participate Choquette's Care So The Personal Capacity Allegations Against Them Should Be Denied**

To hold a defendant liable for damages in a § 1983 claim, the wrongdoer must personally cause a constitutional violation. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. *Id.* Vague and conclusory allegations of official participation in civil rights violations are not sufficient to state a claim for relief.[8] *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992) (per curiam).

Choquette alleges that Dr. Hayes "designated and authorized Defendant DuVall to respond to Non-Formulary Requests and deny Choquette's treatment over the recommendation of a treating physician". In his declaration, Dr. Hayes states, "while it is true that the Chief Medical Officer and the Director of Pharmacy designate pharmacists to conduct utilization reviews of NFRs, I was not the DOC Director of Pharmacy until July of 2014, which was after the dates of the NFRs at issue in this case". Hayes Dec. ¶ 4. Dr. Hayes states, "I did not appoint Dr. DuVall or Dr. Southern, who are both licensed Doctors of Pharmacy, to conduct utilization review of the November of 2013 and January 2014 NFRs". Hayes Dec. ¶ 4. He also states,"[t]o

---

[8] In addition, Defendants cannot be held liable based on a respondeat superior theory of liability. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 3:15-CV-05838-BHS-JRC

20

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

the best of my recollection, I was not involved in any of the decisions related to Mr. Choquette's care. My only potential involvement was that I was on a general email distribution list for Mr. Choquette's Non-Formulary requests (NFR) in November of 2013 and January 2014. I do not recall reading the emails. I do not recall or believe that I responded to the emails". These facts simply cannot demonstrate that he acted with deliberate indifference.

Likewise, Defendant Bovenkamp's only action in this case was to sign a grievance appeal with input from Dr. Hammond. But non-medical staff, are "entitled to defer to the judgment of jail health professionals" so Choquette's claims against Bovenkamp fail. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

**F.    Even If Choquette Had Plead A Cognizable Eighth Amendment Claim, All Of The Defendants Would Be Entitled To Qualified Immunity**

To prevail on his damage claims, Choquette must defeat the defense of qualified immunity. *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016). Qualified immunity is an *immunity from suit* rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the Defendants in this matter are entitled to a ruling on qualified immunity early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

To defeat a claim of qualified immunity, Choquette must show, "first, [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right was clearly established at the time of the alleged misconduct." *Taylor v. Barkes,* 135 S. Ct. 2042, 2044, (2015) (per curiam) (internal quotation marks omitted). The Court may decide which step of the analysis to undertake first. *Pearson v. Callahan,* 555 U.S. 223, 236, (2009). Failing at either one will negate Choquette's eligibility to recover damages. *Id.*

As explained above, Choquette has failed to demonstrate that he suffered a deprivation of a constitutional right. However, even if he could make such a showing, he could not prevail on the "clearly established" prong of the qualified-immunity analysis. "The Supreme Court has

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

21

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

repeatedly emphasized that, to determine whether a given right was "clearly established" at the relevant time, the key question is whether the defendants should have known that their specific actions were unconstitutional given the specific facts under review." *Hamby*, 821 F.3d at 1090. As stated in *Hamby*, the Ninth Circuit has been repeatedly chastised for conducting the clearly established inquiry at too high a level of generality. *Id.; see e.g., City & Cty. of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1775–76, (2015). For instance, a statement that Choquette has overcome the second prong of the qualified immunity analysis because "deliberate indifference to a serious medical need is clearly established law in the Ninth Circuit" would be reversible error because it would be predicated on an unacceptably high level of generality contrary to established controlling precedent. *Hamby*, 821 F.3d at 1094.

To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that *what he is doing* violates that right." *Taylor,* 135 S. Ct. at 2044 (emphasis added) (quoting *Reichle v. Howards,* 566 U.S. 658 (2012)). Although a plaintiff need not find "a case directly on point, ... existing precedent must have placed the ... constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). That is, existing precedent must have "placed beyond debate the unconstitutionality of" the officials' actions, as those actions unfolded in the specific context of the case at hand. *Taylor,* 135 S. Ct. at 2044. Hence, a plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." *Id.* at 2045.

### 1.   There Is No Clearly Established Law That Denying Treatment Based On A Security-Based Policy Rather Than A Prisoner's Individual Medical Needs Is Unconstitutional

As stated above where, as here, a policy is security-based and does not completely foreclose provision of the requested treatment in individual cases, that policy is constitutional.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

22

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

*Kosilek*, 774 F.3d at 90-91; *Chess,* 790 F.3d at 974[9]. So the clearly established law is contrary to Choquette's claim.

### 2. It Is Not Clearly Established Law That Relying On The Opinions Of Prison Physicians To Deny Treatment Recommended By A Prisoner's Outside Consultant Is Unconstitutional

Many published opinions hold that prison providers are in a better position than outside consultants to have the last say on treatment. *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) (inmate alleged that prison officials failed to follow the recommendations of her outside consultants. Held: "a prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment"); *Long v. Nix*, 86 F.3d 761, 765–66 (8th Cir. 1996) (prison officials' decision not to treat inmate with tranquilizers recommended by outside specialist is "a classic example of a matter for medical judgment" that does not rise to the level of cruel and unusual punishment). So there is no clearly established law that prison medical providers must always defer to the medical opinion of outside consultants particularly where, as here, there are prison security concerns.

### 3. Other Federal Courts Have Found The Facts In This Case Do Not Amount To A Constitutional Violation; Thus There Cannot Be Clearly Established Law To The Contrary

In *Savage v. Troutt,* No. CIV-15-670-H, 2016 WL 8711398, at *7 (W.D. Okla., Aug. 12, 2016), an Oklahoma District Court was faced with the case of an inmate with multiple sclerosis whose outside neurologist recommended Gabapentin but was denied the drug by his prison providers. The *Troutt* Court dismissed the Plaintiff's claims as his claims amounted to nothing more than a difference of medical opinion about the course of treatment or the efficacy

---

[9] Defendants cite to these cases assuming *arguendo* that the opinions of Circuit Courts of Appeal can make clearly established law. This is an open question, however, and the Supreme Court has said so long as "none of *our* precedents 'squarely governs' the facts here," qualified immunity applies (emphasis supplied). *Mullenix v. Luna*, 136 S. Ct. 305, 310 (2015). So there is some authority for the proposition that only the Supreme Court can make "clearly established" law. Regardless, where there is a Circuit split there cannot be clearly established law because "[t]o be clearly established, a right must be sufficiently clear [to] *every* reasonable official", not just a reasonable official in one part of the county. *Taylor*, 135 S. Ct. at 2044 (emphasis added). There is only one constitution for the entire nation, not separate ones for each Circuit.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

23

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

of treatment, which the *Troutt* Court said does not state a § 1983 claim. Thus, relevant on point case law does not support Plaintiff's claims.

## G.   Choquette Is Not Entitled To Injunctive Relief

A "plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Specifically, the plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Further, Courts should not enjoin conduct that has not been found to violate any law. *See e.g., Penthouse Int'l, Ltd. v. Barnes,* 792 F.2d 943, 950 (9th Cir. 1986).

Here, as explained above, Choquette cannot establish that the Defendants have violated the law. He has not suffered irreparable harm because his own Complaint confirms that he has been provided the Gabapentin prescription he requested. And the balance of hardships favors the Defendants because a court order requiring DOC to abandon its Gabapentin protocol would endanger the safety and security of DOC facilities. Further, Choquette has no standing for injunctive relief regarding his challenge to the Gabapentinoid protocol. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) ("past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present, adverse effects."). Choquette is receiving Gabapentin and it is pure speculation that this status will change in the future.

## V.   CONCLUSION

Accordingly, Defendants respectfully request that this Court grant their Motion for Summary Judgment and dismiss Choquette's Complaint with prejudice.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

24

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

RESPECTFULLY SUBMITTED this 16th day of October, 2017.

ROBERT W. FERGUSON
Attorney General


s/ Aaron Williams
AARON WILLIAMS, WSBA #46044
Assistant Attorney General
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445
AaronW@atg.wa.gov

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

25

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

**CERTIFICATE OF SERVICE**

I certify that on the date indicated below, I caused the foregoing DEFENDANTS' MOTION FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Jesse Wing                    JesseW@MHB.com; Esmeraldav@mhb.com

Tiffany M. Cartwright         TiffanyC@MHB.com; Lauraf@mhb.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 16th day of October, 2017, at Olympia, Washington.

s/ Katrina Toal
KATRINA TOAL
Legal Assistant 3
Corrections Division
PO Box 40116
Olympia WA  98504-0116
(360) 586-1445
KatrinaT@atg.wa.gov

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO.  3:15-CV-05838-BHS-JRC

26

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445