**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| ETIENNE L. CHOQUETTE, | NO.  3:15-CV-05838-BHS-JRC |
| Plaintiff, | DEFENDANTS' TRIAL BRIEF |
| v. | |
| CHRIS DUVALL, et al., | |
| Defendants. | |

The Defendants, Chris DuVall, Michelle Southern, and Steven Hammond, by and through their attorneys, ROBERT W. FERGUSON, Attorney General, AARON WILLIAMS, and MICHELLE YOUNG, Assistant Attorneys General, hereby respectfully submit their trial brief to assist the Court in making evidentiary rulings, addressing Rule 50 motions for judgment as a matter of law, and determining proper jury instructions.

## I.     STATEMENT OF FACTS

### A.     Summary of the Case

Plaintiff Etienne Choquette is a state prisoner in the custody of the Washington Department of Corrections (DOC). Mr. Choquette was diagnosed with multiple sclerosis (MS) before coming into DOC custody in 2011. However, prior to that time, he had a long history of being considered disabled since 2000 due to multiple vague issues not easily characterized by medical diagnoses including low back pain and radiating leg and toe pain. Mr. Choquette took several narcotic pain medications during this time until he suffered

DEFENDANTS' TRIAL BRIEF
NO.  3:15-CV-05838-BHS-JRC

1

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

withdrawal symptoms from narcotics when he entered county jail after his arrest in 2009. He also has a history of taking marijuana, cocaine, and methamphetamines prior to his incarceration without a prescription for those substances.

Some patients with MS experience neuropathy, which is a neurological condition that may cause pain---called neuropathic pain. Mr. Choquette contends that he experiences neuropathic pain associated with MS. He claims that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to a serious medical need when his treatment with the prescription drug Gabapentin was discontinued for approximately four months between December 2013 and April 30, 2014. Gabapentin is an anticonvulsant drug that is sometimes used off-label (meaning without Food and Drug Administration approval) by physicians to treat different types of pain, including neuropathic pain. Mr. Choquette claims that he needs Gabapentin to treat his neuropathic pain.

Defendant Dr. G. Steven Hammond, M.D. was the Chief Medical Officer for DOC during relevant periods in 2013 and 2014. Defendants Dr. Michelle Southern and Dr. Cris DuVall, were pharmacists employed by DOC during relevant periods in 2013 and 2014. Defendants deny being deliberately indifferent to Mr. Choquette's medical needs. They contend Mr. Choquette did not exhibit objective symptoms consistent with the pain he reported and that Gabapentin is abused by patients in the prison setting. They contend that Mr. Choquette's Gabapentin treatment was temporarily discontinued while an investigation was conducted into whether or not it was medically required for him as a patient residing in the clinical setting of a prison given his symptoms and the security risks the drug presents. After DOC sent Mr. Choquette to an MS specialist for a consultation, he was approved to resume treatment with Gabapentin on April 30, 2014. Mr. Choquette has been approved for Gabapentin treatment each year since 2014.

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

2

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

**B. Gabapentin Abuse and the DOC Formulary**

Prior to December of 2013, DOC medical providers had a growing concern about both what seemed to be a surprisingly high number of requests for the use of Gabapentin and multiple reports in literature, medial conferences, and in clinical experience that Gabapentin has a significant abuse potential, especially in the prison environment. The concern over Gabapentin abuse is widely shared in correctional facilities throughout the country. As DOC Director of Prisons Robert Herzog will testify, contraband drugs, including prescription drugs of abuse, have always and continue to present a serious risk of harm to the employees, inmates, and any other people who visit DOC correctional facilities. Use of sought-after prescription drugs can lead to coercion and extortion of inmates who have prescription access to them. Inmates who are high on drugs can act out violently toward other inmates and staff members. In addition, inmates who abuse drugs may be less able to protect themselves from other inmates because these drugs can cloud their minds and slow reaction times. Drug abuse in prison encourages the formation and strengthening of prison gangs and results in violence between the various gangs as they compete for a share of the illicit drug market. It is an ever-present threat to security that is taken very seriously by correctional professionals.

In accordance with DOC Policy 650.020, Pharmaceutical Management, the Pharmacy and Therapeutics Committee (P&T Committee), which consists of DOC pharmacists, medical doctors, and other medical providers, is responsible for recommending updates of the Pharmaceutical Management and Formulary Manual (Formulary). The DOC Formulary regulates drug dispensation within DOC. Because of the safety and security concerns regarding Gabapentin abuse, the P&T Committee decided to make Gabapentin non-formulary, which would require a careful review of requests to treat with Gabapentin in individual cases. P&T Committee minutes reflect this concern. For instance, P&T Committee minutes from September 21, 2012---more than a year before the events at issue here arose in December of 2013---state, "[t]he committee discussed the potential risks (patient safety &

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

3

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Security) and overutilization of such agents [Gabapentin and Lyrica] and past history of Gabapentin utilization in WA-DOC." Those minutes also state that the committee voted to make non-formulary approvals for Gabapentin limited to one year with a new Non-formulary Request (NFR) approval required each year. Both Defendants Dr. DuVall and Dr. Hammond were members of the P&T Committee prior to December of 2013.

The DOC Formulary contains detailed procedures for DOC pharmacists who review NFR's submitted by DOC providers on behalf of patients. These pharmacist procedures are considered part of a process known as utilization management, which is common in managed care settings such as DOC and is specifically permitted by state statute. The pharmacist Defendants in this case, were acting in accordance with the DOC formulary when they made the decisions at issue in this matter. In his deposition, Dr. Hammond explained that is was his expectation as DOC Chief Medical Officer that pharmacists would make their NFR determinations based on the formulary. The DOC Formulary in effect in December of 2013 contains an appeal process for providers who disagree with a pharmacist's decision not to approve an NFR. The appeal process includes a review by a committee of pharmacists, medical providers, and the Chief Medical Officer.

## C.     Mr. Choquette's Non-formulary Requests for Gabapentin

On November 7, 2013, DOC sent Mr. Choquette to see Neurologist Steven Chung, M.D. In his report, Dr. Chung stated, "[t]he patient's neurological exam was essentially normal except for subjectively reduced pinprick sensation over the left upper and lower extremities." Dr. Chung went on to state:

> Based on my examination, I do not feel that the patient has a multiple sclerosis exacerbation. It appears he remains stable on Avonex injection for multiple sclerosis.
>
> However, he is experiencing chronic symptoms of multiple sclerosis primarily of muscle spasticity and neuropathic pain.
>
> For the muscle spasticity/muscle spasm, baclofen may be increased to 30 mg three times a day. For neuropathic pain, the Gabapentin may be increased with

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

addition of 600 mg in the midday and consider increasing to 1200 mg three times a day thereafter.

On November 27, 2013, non-party Physician's Assistant JoElla Phillips, submitted an NFR for approval of Gabapentin at 800 mg three times a day. According to Dr. Hammond, the way the November 27, 2013 NFR was worded, it was not clear what neuropathic pain process or condition the Gabapentin was being proposed as treatment for. While the NFR lists Multiple Sclerosis as a diagnosis, it also lists chronic back pain from degenerative joint disease as a relevant diagnosis. In Dr. Hammond's clinical experience of treating patients with Multiple Sclerosis, neuropathic pain is not a common symptom of Multiple Sclerosis. The NFR stated nothing about neuropathic pain. However, it did discuss a history of documented findings of a right side herniated disc impinging the nerve root and with severe piercing pain in the low back.

The November 27, 2013 NFR was not approved by Dr. Cris DuVall, PharmD after extensive discussion with others, including Dr. Hammond, because she was tasked with responding to the NFR in accordance with the Formulary utilization management procedures. Dr. DuVall will testify that she, Dr. Hammond and others were concerned that Mr. Choquette may be abusing the drug. This statement is supported by her contemporaneous email in which she stated,"[s]he is requesting a *big* jump from 2400 to 3600 mg/day. DJD and chronic back pain are not indicated used for gabapentin IMHO." (Emphasis supplied.) Similarly, Dr. Hammond, will explain that he had some doubts about Mr. Choquette's "intractable" pain, and the severity and origin of that pain. Because Mr. Choquette's clinical presentation was not well defined, it was not clear that Gabapentin was necessary in his case, especially given the potential for abuse. Accordingly, Dr. DuVall recommended clinical observation and management without Gabapentin to evaluate the actual efficacy (or lack thereof) of that drug to treat Mr. Choquette's alleged symptoms. She also recommended increasing another drug—Baclofen—to a maximum of 150 mg per day.

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

5

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

PA Phillips did not appeal Dr. DuVall's decision regarding the November 27, 2013 NFR for Gabapentin. In a Primary Encounter Report (PER) dated December 5, 2013, PA Phillips stated:

> Pt presents to clinic today at my request because the NFR for Gabapentin was denied. I have talked with Dr. Chung, his neurologist, about Dr. Hammond's recommendation to stop the Gabapentin and to use Baclofen 150mg PO divided doses over the day. Dr. Chung said that neuropathic pain does go along with MS, but that this might be a good opportunity to determine if his pain is mostly neuropathic or due to spasticity.

PA Phillips went on to state in the "plan" section of the PER:

> Discussed with pt that I filed a renewal of the NFR for Gabapentin but that it was denied. At the suggestion of Dr. Hammond and agreement with Dr. Chung, we are going to try increasing the dose of Baclofen and see if that manages the pain. I am titrating Baclofen up to 40 mg TID, If pain is not managed at that level, or is not tolerated let me know.

Accordingly, Dr. Chung was in agreement with the plan to try Baclofen. In her deposition, Mr. Choquette's expert, MS Specialist Dr. Wundes, testified that while she was not surprised the Baclofen trial did not work; it was "not unreasonable to try. We try a lot of things."

Mr. Choquette was then tapered off of Gabapentin. After several weeks of trial with the higher dose of Baclofen, PA Phillips submitted another NFR for Gabapentin on January 6, 2014, this time with more information about Mr. Choquette's symptoms as they related to pain secondary to Multiple Sclerosis. Defendant Dr. Michelle Southern, PharmD, conducted the NFR review. As part of the NFR process, Dr. Southern conducted research into the efficacy of Gabapentin for Multiple Sclerosis in a resource that is available to DOC providers called Up-To-Date. Up-To-Date, contains summaries of the latest clinical evidence for treating medical conditions. Her research indicated that the only potential use for Gabapentin in Multiple Sclerosis cases is limited to off-label treatment of nystagmus, which is an eye condition. Dr. Southern did not approve the request, but she asked PA Phillips to "please

DEFENDANTS' TRIAL BRIEF
NO.  3:15-CV-05838-BHS-JRC

6

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

refer this patient's case to [Care Review Committee[1]] for additional review, and if approved then an NFR can be resubmitted at that time."

PA Phillips examined Mr. Choquette on January 16, 2014 in preparation for her presentation to the CRC. She confirmed that he could perform all of his activities of daily living as of that date. On January 29, 2014, PA Phillips presented Mr. Choquette's case to the CRC for a determination of the medical necessity for treatment of neuropathic pain secondary to Multiple Sclerosis. The CRC, with Dr. Hammond present, discussed Mr. Choquette's case and determined that there was insufficient objective evidence to support a determination of medical necessity for treatment of neuropathic pain at that time. Instead, the CRC discussed sending Mr. Choquette to a Multiple Sclerosis specialist to provide more information about his condition in light of his symptoms.

Mr. Choquette was then transferred to another facility, the Monroe Correctional Complex (MCC), in Monroe Washington, to await his appointment with the specialist. Because of transportation needs, the clinic's work load, and the need to send medical records to a specialist before they will decide to see a patient, it took several weeks (until April 17, 2014) to schedule an appointment with the Harbor View Multiple Sclerosis Clinic for Mr. Choquette. According to Dr. Hammond, this delay was not foreseeable or intentional.

On April 17, 2014, Mr. Choquette was seen by Neurologist and Multiple Sclerosis Specialist, Dr. Annette Wundes, M.D. She recommended that DOC restart Gabapentin for neuropathic pain and spasticity. Her report is silent about Mr. Choquette's past history with drug abuse, which is a counter-indication for Gabapentin.

Just six days later, on April 23, 2014, Mr. Choquette's case was again presented to the CRC, this time by his physician in Monroe, Dr. Diego Lopez de Castilla, M.D. The CRC,

---

[1] For assistance with determining whether a specific medical condition meets DOC criteria for medical necessity, the Department convenes a Care Review Committee (CRC) on a weekly basis. The CRC includes primary care physicians, Physician Assistants, and Advanced Registered Nurse Practitioners. The proposed health care interventions considered by the CRC are typically those that do not appear to clearly meet DOC medical necessity criteria but may under certain clinical circumstances.

DEFENDANTS' TRIAL BRIEF
NO.  3:15-CV-05838-BHS-JRC

7

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

with Dr. Hammond present, reported that his neurological exam was normal and that the remainder of his exam was "completely normal." Their report also shows that Mr. Choquette had been in the infirmary at Monroe for two months without Gabapentin and was still "very functional." In his deposition, Dr. Lopez de Castilla testified, that when he presents to the CRC on a drug of abuse, he looks at the patient's history of drug abuse prior to incarceration. This was confirmed by the mention of Plaintiff's history of polysubstance abuse in the CRC report of that date. Dr. DuVall, likewise testified that Plaintiff's medical records were considered in making the decision in December of 2013 to discontinue Plaintiff's Gabapentin.

The CRC's determination on April 23, 2014 was that treatment with Gabapentin was not medically necessary at that time given the information known at that time. However, the committee suggested that Dr. Lopez de Castilla contact the consulting neurologist, Dr. Wundes, regarding the committee's concerns about the appropriateness of Gabapentin for the patient. The drug label from the manufacturer of Gabapentin states:

> A small number of postmarketing cases report misuse and abuse. These individuals were taking higher than recommended doses of Gabapentin for unapproved uses. Most of the individuals described in these reports had a history of poly-substance abuse or used Gabapentin to relieve symptoms of withdrawal from other substances. When prescribing Gabapentin carefully evaluate patients for a history of drug abuse and observe them for signs and symptoms of Gabapentin misuse or abuse (e.g., development of tolerance, self-dose escalation, and drug-seeking behavior).

Dr. Wundes' report makes no mention that she ever asked Mr. Choquette about any history of drug abuse. In fact she was, until her deposition, unaware of the phenomena of Gabapentin abuse. She testified in her deposition that she does now agree that when prescribing Gabapentin, providers should carefully evaluate patients for a history of drug abuse and observe them for signs and symptoms of Gabapentin misuse or abuse.

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

8

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

On April 23, 2014, Dr. Diego Lopez de Castilla emailed Dr. Wundes explaining:

Gabapentin is a restricted drug in the Department of Corrections. For that reason I presented Mr. Choquette to the Clinical Review Committee this morning and requested to get approval for Gabapentin. The Committee denied the use of Gabapentin.

The Committee felt that the use of Gabapentin was more based on a clinical symptom (reported by the patient with prior history of Polysubstance abuse) rather than on an objective abnormality on physical exam. The Committee asked me to contact you and ask for your opinion.

Dr. Wundes responded in a strongly worded email explaining that she had not seen Gabapentin abuse in her practice and that she did not doubt the presence of Mr. Choquette's pain. Dr. Lopez de Castilla then emailed Dr. Hammond asking, "should I present to the CRC next week." Dr. Hammond responded stating:

Yes, I would recommend re-presenting in light new information. I beg to differ with some of Dr. Wundes' expressed opinions but that is neither here nor there, although I will grant that she is the expert in evaluating and managing MS.

Having worked in several care settings it is interesting how one's clinical understanding is shaped by different practice experiences.

Seven days later, on April 30, 2014, Dr. Diego Lopez de Castilla presented Mr. Choquette's case to the CRC again. With the benefit of the reassurances from Dr. Wundes, the CRC authorized treatment with Gabapentin as Level I—medically necessary. In her deposition, Dr. Wundes said it was not unusual or improper for primary care providers to identify an issue with a drug and request clarification from a specialist consultant.

Mr. Choquette has remained on Gabapentin ever since April 30, 2014. His case has been reviewed annually as required by the DOC Formulary and each time his requests for treatment with Gabapentin have been approved. Dr. Hammond states, "I strongly support the annual review of Gabapentin. It is important to make sure that patients are still getting a therapeutic benefit from the drug and that the drug is not being abused or diverted."

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

9

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

## D. Procedural History

This case was filed in 2016. After a Rule 12(b) Motion to Dismiss was converted to a Motion for Summary Judgment, the parties engaged in extensive discovery. Defendants then moved for summary judgment and the court adopted Judge Creatura's Report and Recommendation that Defendants' motion be granted with regard to injunctive relief as that claim was moot and Defendants' motion be granted with respect to Defendants Hayes and Bovenkamp, because they did not personally participate in the alleged constitutional violations. Dkt. 108 at 17-18; Dkt. 122 at 1-2. The adopted R&R recommended that the Eighth Amendment claims against Defendants Hammond, DuVall and Southern go to trial. Dkt. 108 at 17-18; Dkt. 122 at 1-2.

## II. LAW AND ARGUMENT

### A. Ninth Circuit Precedent Holds that in Cases Like This One, the Jury Should Be Instructed to Give Deference to Defendants in the Adoption and Execution of the DOC Formulary Requirements That Were Needed to Prevent Gabapentin Abuse

In *Chess,* that Ninth Circuit held that, "a trial judge may instruct a jury to defer to a policy or practice adopted and implemented by prison officials only when that policy or practice addresses bona fide safety and security concerns, and when there is evidence that the challenged medical decision was made pursuant to that security-based policy or practice." *Chess v. Dovey*, 790 F.3d 961, 974 (9th Cir. 2015). Defendants have offered the testimony of Dr. Kenney and Director Herzog to address the issue of whether concerns over the use of Gabapentin and safety and security are "bona fide." The second issue of whether there is evidence that the challenged medical decisions in this case were made pursuant to a security-based policy or practice can be met where, "one party's presentation of the case plausibly draws a connection between the security-based policy or practice and the medical care decision at issue." *Chess,* 790 F.3d at 974. The *Chess* Court found that there was no evidence presented at trial that the no-narcotics policy in question in that case, "affected the key decision he challenged—defendants' decision to cut off methadone, rather than tapering it

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

10

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

off while he was in the CTC." *Id.* This is because the policy in that case actually allowed for the provision of narcotics in the CTC, which was something similar to a hospital at the facility. *Id.* at 974-975.

Here, the facts are very different. The challenged decisions are those of two pharmacists and a physician who participated in the Non-formulary discussion of the first decision not to approve the December 2013 NFR. The pharmacists here will testify that they were acting pursuant to their statutorily permitted utilization management role as defined and governed through the DOC Formulary. Wash. Rev. Code § 16.64.011(28). Gabapentin specifically was made a non-formulary or restricted formulary drug because of its abuse potential as demonstrated in P&T Committee meeting minutes and facility medical director minutes *prior* to the events in this case. So when the pharmacists performed their utilization management duties in this case, they were acting pursuant to security-based policy or practice—the Formulary and the practices it requires for handling requests for Gabapentin— when making the medical care decisions at issue. The connection required in *Chess* will, therefore, be demonstrated at trial and Defendants should be permitted to have the Ninth Circuit's deference instruction, which states, "[i]n determining whether the defendant violated the plaintiff's rights as alleged, you should give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security." Ninth Circuit Model Civil Instruction 9.27.

**B.      Deliberate Indifference Under the Eighth Amendment is a High Legal Standard That Should Be Reflected in the Jury Instructions for this Trial**

To establish an Eighth Amendment violation, a prisoner "must satisfy both the objective and subjective components of a two-part test." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citing *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2002). First, there must be a demonstration that the prison official deprived the prisoner of the "minimal civilized measure of life's necessities." *Id.* (citation omitted). Second, a prisoner must

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

demonstrate that the prison official "acted with deliberate indifference in doing so." *Id.* Deliberate indifference is a high legal standard. *Toguchi*, 391 F.3d at 1060. It is comparable to criminal recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir. 1992); *Schaub v. VonWald*, 638 F.3d 905, 933–34 (8th Cir. 2011) (Plaintiff bears the burden of proving that the Defendant's mental state was akin to criminal recklessness: disregarding a known risk to the inmate's health.). This rigorous standard is greater than gross negligence. *Toguchi*, 391 F.3d at 1060 (even gross negligence is insufficient to establish deliberate indifference).

In addition, to prove deliberate indifference, a plaintiff must establish more than inadvertent or isolated instances of neglect. *Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir. 1990); *see also Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (an inadvertent failure to provide adequate medical care does not state an Eighth Amendment claim). Finally, it is established law that, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel,* 681 F.3d 978, 987 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard,* 744 F.3d 1076, 1083 (9th Cir. 2014).

The Ninth Circuit pattern jury instruction regarding Eight Amendment medical cases gives the jury the following definition of deliberate indifference, "the conscious choice to disregard the consequences of one's acts or omissions." Ninth Circuit Model Civil Instruction 9.27. Unfortunately, that definition of deliberate indifference appears to come from *Tatum v. Moody*, 768 F.3d 806, 813 (9th Cir. 2014), which involved police withholding evidence from an arrestee so it is not applicable to an Eighth Amendment medical care case. The appropriate definition of deliberate indifference in this context comes from the Ninth Circuit's opinion in *Toguchi*, which states:

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

12

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

A prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." This "subjective approach" focuses only "on what a defendant's mental attitude actually was." "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."

391 F.3d at 1057 (internal citations omitted). Defendants believe that this is the appropriate definition of deliberate indifference that should be presented to the jury.

**C.     State Law Concepts of Medical Negligence Such as the "Standard of Care in the Community" and the "Scope of Practice" Are Not Relevant to An Eighth Amendment Claim and Should Not be Considered by the Jury**

It is well settled that, "a showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Id.*, at 1060. As explained by the Supreme Court, "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at 105. Accordingly, it would be inappropriate for testimony at trial to focus on terms of art related to state medical negligence claims such as the "Standard of Care" or "the Scope of Practice." These terms would only serve to confuse the jury about the appropriate standard they must apply in a federal Eighth Amendment medical case.

**D.     Each Defendant's Individual Conduct Must Be Examined Separately In Light of Their Own Knowledge at the Time of Their Challenged Acts or Omissions**

DOC is not a Defendant in this litigation so its collective actions as an agency are not before the Court. To hold an individual capacity defendant liable for damages in a § 1983 claim, the wrongdoer must personally cause a Constitutional violation. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

DEFENDANTS' TRIAL BRIEF
NO.  3:15-CV-05838-BHS-JRC

13

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a Constitutional deprivation. *Id.* Accordingly, the jury should not hold the Defendants liable for any actions in which they did not personally participate.

### 1. Defendant DuVall

Defendant DuVall's only involvement in this matter was in not approving the November 27, 2013 NFR for Gabapentin. As explained above, that NFR was not clear and did not mention neuropathic pain. Dr. DuVall consulted with others including a physician, Dr. Hammond, in making her decision. She also recommended a replacement for Gabapentin, Baclofen, which might address Mr. Choquette's pain if it was due to spasticity rather than neuropathic pain. Given her suspicions that Mr. Choquette might be seeking the drug for non-therapeutic reasons, her conduct was not deliberately indifferent but, rather, constituted considered medical judgment given the request, the drug being requested, and the fact that the patient resided in a prison where Gabapentin can cause serious safety and security concerns for both the patient and others.

### 2. Dr. Hammond

Dr. Hammond's involvement in this case was simply responding Dr. DuVall's emails in December of 2013 regarding the appropriateness of Gabapentin in this case. His clinical experience with MS did not include neuropathic pain as a common symptom of the disease. Furthermore, he suspected that Mr. Choquette might not be experiencing the pain he claimed. Dr. Hammond also questioned the purported source of the pain and whether Mr. Choquette was seeking the drug for non-therapeutic purposes. Given these concerns, Dr. Hammond's actions were not deliberately indifferent.

Dr. Hammond also participated in two CRC meetings regarding this case. In the first in January of 2014, there was information that Mr. Choquette was functioning fairly well without Gabapentin so the committee determined that it did not have enough objective information to make a decision on medical necessity at that time. Instead, the committee discussed sending Mr.

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

14

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Choquette to a MS specialist for a second opinion. This shows that, far from being deliberately indifferent, the CRC was actually attempting to make sure that Mr. Choquette was receiving the correct treatment. Sending someone to a specialist is not deliberate indifference.

Finally, Dr. Hammond participated in the second CRC meeting regarding this case in which the committee asked Dr. Lopez de Castilla to speak to Dr. Wundes, the MS specialist, and express the committee's concerns over abuse. After Dr. Wundes explained that she believed Mr. Choquette's reports of pain, Dr. Hammond recommended that Dr. Lopez de Castilla re-present the case to the CRC. These actions also do not support a claim of deliberate indifference.

### 3. Dr. Southern

Dr. Southern's only involvement in this case was not approving the second NFR for Gabapentin in January of 2014. But she researched whether the drug was appropriate for the condition and found that it was not. She also recommended that PA Phillips present Mr. Choquette's case to the CRC. Again, these actions do not show a conscious disregard for Mr. Choquette's care.

## E. Defendants are Entitled to Qualified Immunity

To defeat a claim of qualified immunity, Mr. Choquette must show, "first, [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right was clearly established at the time of the alleged misconduct." *Taylor v. Barkes,* 135 S. Ct. 2042, 2044 (2015) (per curiam) (internal quotation marks omitted). The Court may decide which step of the analysis to undertake first. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). Failing at either one will negate Mr. Choquette's eligibility to recover damages. *Id.*

Even if he could make a showing of a deprivation of constitutional right, he could not prevail on the "clearly established" prong of the qualified-immunity analysis. "The Supreme Court has repeatedly emphasized that, to determine whether a given right was "clearly established" at the relevant time, the key question is whether the defendants should have known that their specific actions were unconstitutional given the specific facts under review." *Hamby*

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

15

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

*v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016). As stated in *Hamby*, the Ninth Circuit has been repeatedly chastised for conducting the clearly established inquiry at too high a level of generality. *Id.; see e.g., City & Cty. of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1775–76 (2015).

"To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that *what he is doing* violates that right." *Taylor,* 135 S. Ct. at 2044 (emphasis added) (quoting *Reichle v. Howards,* 566 U.S. 658 (2012)). Although a plaintiff need not find "a case directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). That is, existing precedent must have "placed beyond debate the unconstitutionality of" the officials' actions, as those actions unfolded in the specific context of the case at hand. *Taylor,* 135 S. Ct. at 2044. Hence, a plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." *Id.* at 2045.

Here, Defendants contend that the exception to the general rule recognized in *Chess* should apply even if, without deference to safety and security concerns, the jury could find that the Defendants committed an Eighth Amendment violation. Thus qualified immunity would apply.

More importantly, while qualified immunity is a question of law, not a question of fact, when "historical facts material to the qualified immunity determination are in dispute" the district court should submit the factual dispute to a jury. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210-1211 (9th Cir. 2008); *see also* Comment to Ninth Circuit Model Civil Instruction 9.34. The Ninth Circuit has found that a defendant is entitled to qualified immunity if he or she acts pursuant to a statute, regulation or official prison policy if the statute, regulation, or official prison policy is not "patently violative of constitutional principles." *Brown v. Mason*, 288 Fed. App'x 391, 392–93 (9th Cir. 2008); *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999) ("[W]hen a public official acts in reliance on a duly enacted statute or ordinance, that official

DEFENDANTS' TRIAL BRIEF
NO. 3:15-CV-05838-BHS-JRC

16

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

ordinarily is entitled to qualified immunity."). Accordingly, the question of whether the defendants acted pursuant to a statute, regulation, or official policy is a factual issue to be determined at trial by the jury. If the jury finds in Defendants' favor on this issue, the existence of official policies and procedures to guide their actions is strong evidence that a reasonable official would not have known that his or her conduct in following those policies violated clearly established law. So qualified immunity should apply.

**F.      If Plaintiff Prevails, He Is Only Entitled to Nominal Damages**

In *Memphis Community School District,* the Supreme Court held that a § 1983 plaintiff may not recover compensatory damages based on the abstract value of the constitutional right that was violated. *Memphis Community School District v. Stachura*, 477 U.S. 299, 306-308 (1986). Rather, compensatory damages must be grounded in the actual injury suffered by the plaintiff because of the defendant's actions. *Id*. at 308. *See also Carey v. Piphus,* 435 U.S. 247, 264 (1978) (holding that no compensatory damages could be awarded for violation of a constitutional right absent proof of actual injury). Here, Mr. Choquette is not entitled to any damages because he is unable to show a constitutional violation. Even if he were able to show a constitutional violation, he is limited to nominal damages based on the evidence presented here. *See Floyd v. Laws*, 929 F.2d 1390, 1402 (9th Cir. 1991) (holding that nominal damages may be awarded in successful § 1983 cases with no actual damage).

**G.      Compensatory Damages for Mental or Emotional Injury May Not Be Awarded Without a Prior Showing of Physical Injury or the Commission of a Sexual Act**

Pursuant to 42 U.S.C.A. § 1997e, states, in the relevant part:

(e) Limitation on recovery
No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Here, there are no allegations against Defendants regarding the commission of a sexual act and Mr. Choquette concedes that he was incarcerated at the time of incidents described in the operative Complaint in 2013 and 2014. Therefore, pursuant to 42 U.S.C. § 1997e, Mr. Choquette must make a prior showing of physical injury in order to be entitled to damages for mental and emotional injury.

Defendants do not concede that pain is physical injury within the scope of 42 U.S.C. § 1997e. It appears to be an open question of whether "pain" is a "physical injury" within the meaning of 42 U.S.C. § 1997e. For instance, in *Sealock v. Colorado*, the Tenth Circuit held that delay in treating a heart attack that caused pain to the plaintiff could support compensation for mental or emotional injury stating:

> We are aware of the limitation on actions by prisoners for mental and emotional injuries without a prior showing of physical injury. *See* 42 U.S.C. § 1997e(e). Assuming without deciding that physical pain constitutes "mental or emotional injury" within the meaning of the statute, appellant satisfies the statutory requirement because he has made a prior showing of physical injury, i.e. his heart attack.

*Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000). So it was the fact that the *Sealock* defendants' conduct exacerbated a heart attack that arguably permitted damages for pain in that case. This case is distinguishable because it is uncontested that Mr. Choquette came into DOC custody with Multiple Sclerosis. Thus, it cannot be said that Defendants "caused" the actual physical injury----Mr. Choquette's multiple sclerosis----which, in turn, caused Mr. Choquette's pain. Defendants contend that damages for pain would logically fit within the scope of 42 U.S.C. § 1997e in a case where the Defendants had, for instance, deliberately broken an inmate's leg, causing pain as opposed to this case where none of the Defendants caused Mr. Choquette's multiple sclerosis condition, which he alleges caused his neuropathic pain.

DEFENDANTS' TRIAL BRIEF
NO.  3:15-CV-05838-BHS-JRC

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

**H. To Prove Compensatory Damages, Mr. Choquette Must Establish the Defendants Proximately Caused Him Harm**

"In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Id*. Consistent with this precedent, Defendants ask the court to approve the following jury instruction:

> In this case, Mr. Choquette has the burden of demonstrating by a preponderance of the evidence that the defendants' conduct was the actionable cause of the claimed injury. To meet this causation requirement, he must establish both causation-in-fact and proximate causation. This means that Mr. Choquette must show that except for the actions of defendants, his injuries and damages would not have occurred and further that such injuries and damages were reasonably foreseeable consequences of the acts or omissions at issue.

As explained previously, the length of Mr. Choquette's stay at MCC was not foreseeable by any of the named Defendants so damages for that period would not be appropriate.

**I. Punitive Damages**

Punitive damages are available only when a plaintiff shows a defendant's conduct was motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). "[A] key feature of punitive damages [is] that they are never awarded as of right, no matter how egregious the defendant's conduct." *Smith v. Wade,* 461 U.S. 30, 52 (1983). Rather, once the plaintiff proves that the defendant's conduct triggers consideration of punitive damages, the factfinder makes the "discretionary moral judgment" whether or not to award punitive damages. *Id.* Here, Defendants did not act with evil motive or intent. To the contrary, at every step, they continued to search for the appropriate care for Mr. Choquette so punitive damages would not be appropriate in this case.

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

**J.      If Mr. Choquette Prevails at Trial, He May Be Awarded Attorney Fees in an Amount No Greater than 150 Percent of His Damages, Including Nominal and Punitive Damages**

The Prison Litigation Reform Act contains a provision limiting the amount of attorney's fees that may be awarded in § 1983 cases filed by inmates to 150% of the money judgment. 42 U.S.C. § 1997e(d); *Robbins v. Chronister*, 435 F.3d 1238, 1240 (10th Cir. 2006) ("The statutory language [of 42 U.S.C. § 1997e(d)] may be inartful, but appellate courts have consistently interpreted the statute to limit a defendant's liability for attorney fees to 150% of the money judgment"); *see e.g., Royal v. Kautzky,* 375 F.3d 720, 725 (8th Cir. 2004)*; Walker v. Bain,* 257 F.3d 660, 667 (6th Cir. 2001) (citing cases). Consequently, because his injunctive claims were dismissed on summary judgment, even if Mr. Choquette prevails on the merits of his claims at trial and this Court awards attorney fees, those fees should be limited to 150 percent of any monetary judgment.

## III.      CONCLUSION

Defendants respectfully submit that, based upon the facts to be presented at trial and the authorities offered in this brief, judgment should be entered for Defendants.

RESPECTFULLY SUBMITTED this 11th day of September, 2018.

ROBERT W. FERGUSON
Attorney General


s/ Aaron Williams
AARON WILLIAMS, WSBA #46044

s/ Michelle M. Young
MICHELLE M. YOUNG, WSBA #52423
Assistant Attorneys General
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445
AaronW@atg.wa.gov
Michelle.Young@atg.wa.gov

DEFENDANTS' TRIAL BRIEF
NO.  3:15-CV-05838-BHS-JRC

20

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on the date indicated below, I caused the foregoing DEFENDANTS' TRIAL BRIEF to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Jesse Wing              JesseW@MHB.com; cathyh@mhb.com; jenniferk@mhb.com; noemiv@mhb.com

Tiffany M. Cartwright   TiffanyC@MHB.com; cathyh@mhb.com; cristyc@mhb.com; jessicat@mhb.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 11th day of September, 2018, at Olympia, Washington.

s/ Katrina Toal
KATRINA TOAL
Legal Assistant 3
Corrections Division
PO Box 40116
Olympia WA  98504-0116
(360) 586-1445
KatrinaT@atg.wa.gov

DEFENDANTS' TRIAL BRIEF
NO.  3:15-CV-05838-BHS-JRC

21